IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MAURICE J. HOLT,

                           Petitioner,

    v.                                       OPINION and ORDER

DYLON RADTKE,                              21-cv-84-wmc

                          Respondent.

---

Petitioner Maurice J. Holt, appearing by counsel, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state convictions for armed robbery, substantial battery, battery, felony intimidation of a victim, and false imprisonment.  Specifically, he contends that the trial court's exclusion of evidence denied him the right to confront witnesses and present a defense in violation of the Sixth and Fourteenth Amendments of the U.S Constitution.  Holt also contends that his trial counsel was ineffective in a variety of ways.  The state filed an answer, with records from the relevant state court proceedings, and the petition is fully briefed.

Holt's defense at trial depended principally on the jury believing that he was not present during the armed robbery at all and that someone else committed the crimes charged. Nevertheless, the trial court improperly prohibited Holt from presenting evidence that may have bolstered his defense, and his counsel performed deficiently by failing to present additional evidence that would have further undermined the state's case.  Although Holt was prejudiced as a result of these errors, the Wisconsin Court of Appeals concluded that the trial court's evidentiary ruling was harmless error, and further that counsel's failure to present other evidence was attributable to a reasonable trial strategy or was not prejudicial at all.  Because this court disagrees for the reasons set forth below, Holt is entitled to habeas relief.

Accordingly, the state must either release Holt from custody or grant him a new trial in which he will have the opportunity to present additional evidence of his innocence that his trial counsel should have presented.

BACKGROUND[1]

### A. Criminal Charges

In December 2013, petitioner Maurice J. Holt was charged with armed robbery, substantial battery, battery, two counts of felony intimidation of a victim, and two counts of false imprisonment, each as a party to the crime.  The charges arose out of an incident that occurred at an apartment in Plover, Wisconsin, in September 2013, during which two victims were physically assaulted and robbed of electronics and guitars.  The victims identified two of the robbers, Archie Biddell and Lyndell Dale, who were caught a few hours later following a high-speed car chase.

The victims identified the third robber as "Deuce" -- a nickname for an individual the court will refer to as "R.G.," who was petitioner Holt's nephew and a friend of the arrested perpetrators.  The victims stated that R.G. had been at their apartment the night before, with Dale and some others.  The victims also described the third robber as six-feet tall and 200 to 210 pounds, a description that matched R.G.  However, the victims later recanted their

---

[1] The following facts are taken from Holt's petition and the state court records provided by Holt and the state.  The court presumes that the factual findings of the state court are correct for the purposes of habeas review unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Since Holt has not provided clear and convincing evidence rebutting the state court findings, the court has deferred to the state court's version of events. *Goodloe v. Brannon*, 4 F.4th 445, 447 (7th Cir. 2021); *Weaver v. Nicholson*, 892 F.3d 878, 886 (7th Cir. 2018).

identification of "Deuce" as the third robber, explaining that they did not see the third robber's face; they were under the influence of marijuana and alcohol; and they were confused.

Approximately three months later, the state accused R.G.'s uncle Holt of being the third robber after he pawned two of the stolen guitars at a music shop in Wausau, Wisconsin, using his own name and address.  Law enforcement executed a search warrant at Holt's home and found numerous property items that had also been stolen from the victims' apartment, including some in Holt's bedroom.  Holt admitted to selling the guitars but lied about how he obtained them, saying that he had bought the guitars from a random girl walking down the street with a bag of stuff she was selling.  Holt also said that some of the stolen property might have come from R.G., who was living in Holt's home at the time.  Holt denied hanging out with R.G., Biddell or Dale, who were about ten years younger than he, and specifically denied participating in the robbery.  Holt was charged with:  armed robbery with use for force; substantial battery; two counts of felony intimidation of a victim; two counts of felony false imprisonment; and misdemeanor battery.  Pleading not guilty to all charges, Holt's case proceeded to a jury trial.

### B.  Jury Trial

At trial, the state's primary evidence was (1) Holt's possession of stolen property within a week after the robbery, (2) false statements he made to police about how he obtained that property, and (3) pre-trial statements of Dale and Biddell implicating Holt in the robbery.  At trial, however both Dale and Biddell recanted their statements that Holt was the third robber.  In Holt's case in chief at trial, defense counsel further asserted that Holt had an alibi at the time of the robbery, and that his nephew R.G., not Holt, was the third robber.  Defense counsel

also stated during opening statements that evidence would exclude Holt as the source of any DNA discovered from the scene of the robbery.

### 1.  Prosecution's case

The state's first witness was S.M., one of the victims.  S.M. testified that on the night before the robbery, he and his roommate, N.P., invited four men into their apartment:  Dale, R.G. (also known as Deuce), and two other men.  The six men hung out together until 2:00 or 3:00 a.m., with some of them smoking marijuana.  S.M. agreed that the following photograph, which had been posted on Lyndell Dale's Facebook page, showed the group of people that had been at the apartment the night before the robbery:



Trial exhibit 1 (dkt. #15-3) (depicting, from left, N.P., Terrance Simmons, Lyndell Dale, R.G./Deuce (circled), and S.M.)

The next night, after S.M. returned home from work around 11:30 p.m., he took a shower and upon leaving the bathroom, heard people talking in the apartment.  He recalled seeing a black man rifling through the closet in N.P.'s room but did not see the man's face.  When S.M. walked into the kitchen, he saw Archie Biddell pointing a silver and black gun in N.P.'s face and ordering him to the ground.  Dale then punched both S.M. and N.P., and Biddell and Dale pushed S.M. into a bedroom.  N.P also moved to the bedroom and lay down, bleeding from his face.  For the next 20 minutes, Dale, Biddell, and the third assailant shoved various property of N.P.'s and S.M.'s into bags and carried them out to a vehicle, while making death threats to the two victims.

S.M testified that he heard the voice of the third assailant asking, "where are the drugs?"  S.M. further testified that he did not get a good look at this third assailant's face but was sure he had never seen him before.  (Trial Tr. (dkt. #14-9) 117.)  He described the third assailant as a black male, six-feet tall and 210 pounds, with a buzz cut, who was wearing a black hoodie and dark pants.  S.M. also acknowledged that immediately after the robbery, he told the police that the third assailant was "Deuce" (R.G.), one of the four men who had visited the victims' apartment the night before.  (*Id.* at 125.)  By the time of trial, however, S.M. stated that he was 100% certain that the third robber was *not* Deuce/R.G., because R.G. did not have the same build as the third robber.  Even so, S.M. could not identify Holt as the third robber at trial.  (*Id.* at 137.)

The second victim, N.P., also testified, stating that on the night of the robbery, Dale arrived at their apartment with two other men he had never met.  One of those men stated that he lived on the eastside of Madison.  Within a few minutes, Dale starting punching N.P., someone showed him a gun and he got down on the ground, where someone continued to

punch and kick him and threaten to shoot him.  N.P. could then hear men carrying things out of the apartment and asking about drugs.  N.P. testified that he, too, told police after the incident that the third assailant was Deuce, but "was really [shaken] up at the time" and was "just throwing out nicknames I'd heard in the past two days.  I wasn't really sure." (*Id.* at 195.)  When asked if he recognized Holt, he testified that he could not say for certain whether he'd seen Holt before (*id.* at 193), but he looked familiar to him and "like" the third robber.  Still, he could not say that he was "positive" that Holt was the third assailant.  (*Id.* at 198.)

The state also called Dale and Biddell as witnesses, both of whom had already pleaded guilty and been sentenced on charges stemming from the armed robbery before Holt's trial.  Both men admitted that they had participated in the robbery and that they had told a detective before trial that Holt was the third assailant.  At trial, however, both testified that they had lied about Holt being the third robber, and that they had identified Holt only because they had seen the criminal complaint against him and thought that they would get better plea deals by identifying him, knowing the prosecutor wanted to pursue Holt.

Biddell further testified that the third assailant was actually a man he'd never met and who did not look like Holt.  He testified that he did not know whether the third person was "R.G." because he did not know who R.G. was.  (Dkt. #14-10, at 173–78.)  During his testimony, Dale denied that either Biddell or R.G. were present at the robbery.  He then refused to answer many of the questions posed, responding with statements such as: "I'm tired of talking"; "I feel like I want to leave"; or "I tried to move on with my life."  After the prosecutor ended his direct examination of Dale, defense counsel moved for leave to cross-examine Dale using two photographs that had been found on Dale's Facebook page and taken just five to seven hours before the robbery.  (Dkt. #15-4 and #15-5.)  During a sidebar, defense counsel

explained that the photographs showed two individuals wearing masks, one of whom was holding a gun. (Dkt. #14-10, at 154.) He further stated that he believed Dale would testify that: the individual wearing a mask and black sweatshirt in the photos was R.G.; Dale was the other person; and that the photos were taken "five to seven hours . . . before the robbery." (*Id.* at 156–57.) He also argued that "it is pretty clear that the individual holding the gun wearing that black sweatshirt is [R.G.]," and that "because our defense is Mr. Holt didn't do it . . . photographs of an admitted, convicted member of this three-person armed robber team [Dale], alongside of another individual who is dressed in clothing similar to what the victims told the officer the third unnamed robber was wearing . . . is very relevant to the jury's determination." (*Id.*) These were the two pictures proffered by counsel:



Photograph posted on Saturday, September 21, 2013 at 4:05 p.m., with the caption, "Squad we mased up @dello".



Photograph posted on Dale's Facebook page on Saturday, September 21, 2013 at 5:15 p.m.

The state objected to the defense's introduction of both photos, arguing that they were irrelevant and showed only character or propensity evidence.   The court agreed, finding the photos were "dark and hard to see," and "don't show anything whatsoever that would indicate to me, much less anyone else, any probative value whatsoever."  (*Id.* at 159.)  Defense counsel then asked if he could at least see whether Dale could identify the people in the photographs, but the court denied this request as well, stating, "I'm going to assume he can't, and even if he can, it's not probative of the case."  (*Id.* at 159–60.)   Dale then refused to answer defense counsel's questions about:  who was with him before the robbery; where he was coming from

8

before the high-speed chase; and whether he even knew R.G.  Further questions about R.G. caused Dale to stop answering altogether, prompting defense counsel to terminate his questioning.

In addition to the two victims and two convicted perpetrators, the state called multiple law enforcement officers involved in the investigation, including the police officer who responded to the scene of the armed robbery.  She testified on cross-examination that one of the victims, N.P., told her that Dale, Deuce and someone named Stevie were the robbers, and that Dale and Deuce had been at the apartment the night before.  (Dkt. #9-9, at 25.)  The state also called the police officer who had interviewed S.M., who testified on cross-examination that S.M. had originally identified a black man wearing a sweatshirt and "snapback hat," who went by Deuce, as the third assailant.  (*Id.* at 38–39.)

Finally, the state called the detective on the case, Brian Noel, who testified that R.G. (Deuce) had been originally suspected of being the third robber.  In particular, local police had informed Noel that R.G. was a known associate of the other two robbers, Dale and Biddell, and Dale referred to this group of friends as the "Vendetta Squad." (Dkt. #9-9, at 99.)  When Noel searched Dale's Facebook page, he found pictures referencing the squad, as well as pictures with Dale and R.G. posing with guns.  Noel testified that one of the pictures of R.G. and Dale displaying firearms was taken "quite near in time to the incident." (*Id.* at 107.)  Noel also testified about a picture taken the day before the robbery of R.G. with Dale and the victims, with R.G. wearing a black hooded jacket and a white hat.  (*Id.* at 103, 106–7.)  The day after the robbery, Noel showed pictures of R.G. to the two victims.  However, at that point, the victims told Noel that the third robber had *not* been R.G./Deuce, because they were certain that the third robber had not been in the apartment the night before the robbery.  (*Id.* at 46.)

Detective Noel further testified that:  there were no Facebook pictures, messages, calls or texts between Holt and Biddell or Holt and Dale; and local police did not mention Holt as a known associate of Biddell or Dale aside from Holt being R.G.'s uncle.  Thus, Noel did not suspect Holt of being involved in the robbery until Holt pawned the stolen guitars to a music shop in Wausau, after which the music shop owner contacted the police.  Police then executed a search warrant at Holt's apartment, which he shared with his girlfriend, Lisa Ricci, and found stolen property throughout the residence, including a Nintendo console and games, an iPod, and headphones in Holt and Ricci's bedroom.  Holt told the police that he lived on the eastside of Madison, but that he was staying with Ricci and was at her apartment the entire weekend of the robbery.  Holt denied being involved in the robbery and told the police that he bought the guitars from a random girl walking down the street and the Nintendo console from a man he met on Craigslist.  (*Id.* at 68–70.)

Noel also volunteered that one possible reason for the robbery was because N.P. had allegedly robbed one of Holt's drug dealers.  (*Id.* at 206.)  Holt's counsel did not object to Noel's implication that was Holt a "drug dealer."

On cross-examination, Holt's counsel asked Noel whether DNA had been collected from the property taken from the victim's home, as well as from Holt.  (*Id.* at 94–95.)  Noel responded that DNA had been collected, but defense counsel never followed up with whether any of Holt's DNA matched that on the stolen property or in the victims' apartment, even though Holt's DNA did *not* match.

Finally, the state called Kenyada Joiner, Dale's brother, who had been incarcerated on the same unit as Holt in the Marathon County Jail after his arrest on the robbery charges. Before trial, Joiner had told Detective Noel that Holt confessed to the robbery in the jail and

10

reported being worried Dale would "snitch" on him.  According to Noel,  Joiner also heard Holt confess to making Dale go along with the robbery by pointing a gun at him.  (*Id.* at 210.)  At trial, however, Joiner both denied remembering any interview with Detective Noel *and* testified that his mother (also Dale's mother) had encouraged him to tell Noel that Holt was involved.  (*Id.* at 199–200.)  Ultimately, Jenner testified that Holt did not actually confess to being involved in the robbery.  (*Id.* at 202.)

### 2.  Holt's defense

Besides pointing to R.G. as the third robber, Holt's other defense theory was his alibi for the weekend of the robbery.  Specifically, Holt testified that he had been staying with friends, Andre and Amy Kelly, the entire weekend of the robbery.  To bolster this defense, Holt presented four witnesses besides himself: Lisa Ricci (Holt's girlfriend); Rocky Noah (Holt's friend); and Andre and Amy Kelly (also Holt's friends).

Rocky Noah testified that he was in jail with Biddell after the robbery.  According to Noah, Biddell told him that R.G and not Holt was involved in the robbery.  Noah also testified that Biddell and Holt did not hang out or get along.  (Dkt. #9-10,  at 46.)

Lisa Ricci testified that she and Holt lived together during the period at issue, and he left home for the entire weekend during which the robbery took place because the two were fighting.  (*Id.* at 16.)  Ricci also testified that R.G. had come to the apartment with several garbage bags of things the day after the robbery.  (*Id.* at 20–21.)  The defense intended Ricci's testimony to support the separate alibi testimony from the Kellys and Holt, but when defense counsel asked Ricci why Holt and she were fighting, she responded that Holt was having trouble finding employment and their family finances were difficult.  On cross-examination, the state

impeached Ricci with pretrial statements she had made suggesting that they had been fighting, in part, over her concern that Holt had been engaging in burglaries and robberies. Ricci then confirmed that she had heard rumors about Holt committing robberies and was worried that it might lead the police to raid their home. (*Id.* at 29.)

Next, Andre and Amy Kelly testified that they had been friends with Holt for years, and he had been at their home the weekend of the robbery because of problems with his girlfriend. (*Id.* at 58–60.) On cross-examination, Andre Kelly acknowledged that he had not reported Holt's alibi to law enforcement right away and had refused to talk to Detective Noel. (*Id.* at 66.) Amy Kelly likewise declined to talk to law enforcement when initially contacted about Holt. (*Id.* at 85–86.) They did not know why Holt had told the police he was at home at Ricci's apartment all weekend. (*Id.* at 72, 88.)

Last, Holt testified on his own behalf, denying *any* involvement in the robbery and testifying that he had been with the Kellys all weekend. Holt also explained his originally telling police that he spent the entire weekend with Ricci was because Andre Kelly and he were both on probation and not supposed to be together. (*Id.* at 103–04.) Holt specifically denied ever seeing the robbery victims and testified that he only saw the garbage bags containing stolen property upon returning home from the Kellys'. While also admitting to pawning the guitars, Holt testified that he had gotten them from R.G., and certainly would not have used his own name to pawn them off if he had known they were stolen. Finally, Holt admitted to lying to the music store employee, and later to the police, about where he had obtained the stolen items because, as a probationer, he did not want to get into trouble and was unsure where R.G. had acquired the guitars.

### 3. Closing Statements, Jury Instructions, Deliberations and Verdict

During his closing statement, the prosecutor represented twice that Andre Kelly had "no convictions," making unbelievable Holt's explanation for neither Andrew Kelly nor he contacting the police about his alibi. (Dkt. #14-11, at 162.) Despite there being *no* evidence one way or the other about whether Andre Kelly had prior convictions or was on probation, Holt's counsel did not object to the prosecutor's representations. Further, even though Holt's alibi was one of his primary defenses, defense counsel also failed to request an alibi instruction for the jury, which would have expressly shifted the burden to the state to *disprove* Holt's alibi. Nor did counsel request a cautionary instruction on other-acts evidence or use of prior convictions for impeachment, despite numerous references to Holt's 14 prior convictions and other uncharged conduct.

During deliberations, the jury asked about Holt's height and weight, but defense counsel failed to offer this evidence despites its failure to match the victims' description of the third assailant, which more closely matched R.G. In the end, the jury convicted Holt on all counts. The court sentenced Holt to 12 years initial confinement, then 15 years extended supervision.

### C. Postconviction Motion and Evidentiary Hearing

Holt filed a postconviction motion challenging: (1) the trial court's exclusion of the masked gunman Facebook photos; and (2) his trial counsel's effectiveness in failing to present evidence supporting Holt's innocence. In particular, beyond the photos, Holt pointed to the following evidence: (a) testimony of Britney Quade, who saw R.G. with Dale and Biddell before and after the robbery; (b) testimony of Michael Hays, a friend of Dale's, who placed

13

R.G. with Dale both before and after the robbery; (c) the relative heights of Holt and R.G., showing Holt was three inches shorter than the unknown robber described by the victims, while R.G. was the correct height; (d) DNA evidence showing Holt was excluded from all the evidence found in the robbery location; and (e) a letter from Dale to R.G. written the day before Dale spoke to police and implicated Holt. The motion also argued that counsel committed numerous other errors, including: opening the door for Ricci's speculation that Holt committed other robberies; failing to object to Dale's volunteered testimony and the prosecutor's improper closing argument; failing to request a jury instruction regarding his alibi defense; and failing to object to the state's improper use of prior conviction and other-acts evidence.

The circuit court held an evidentiary hearing on the motion at which Britney Quade, Lisa Ricci and trial counsel (Jay Kronenwetter) testified. That post-conviction hearing was presided over by a different judge than the judge who had presided over the trial.

### 1. Britney Quade's Testimony

Britney Quade testified that in September 2013, R.G. was living with her part-time and that Lyndell Dale, one of the admitted robbers, visited him regularly and stayed there overnight on occasion. (Dkt. #9-13, at 11-12.) She also testified that on the night of the robbery, Dale, Biddell, R.G. and another "kid" were at her apartment together hanging out and rapping, and she took several pictures of them, including the Facebook pictures of a masked R.G. holding a gun. (*Id.* at 13.) While she was using methamphetamine at the time (*id.* at 15), she also testified that R.G. had brought the gun, and "he thought he was the man all night because he had it." (*Id.* at 19.) She also identified R.G. as wearing the sweatshirt with FLIP on it, stating that he wore it "all of the time—probably almost every day." (*Id.* at 21.) She further recalled

14

them mentioning that they might be returning to Stevens Point, where they had attended a party the night before and "white boys" had been making racist jokes.  (*Id.* at 15, 23.)

Quade also testified that the same group returned after midnight, carrying a TV, video game systems, cell phones and laptops.  (*Id.* at 24.)  Quade heard one of them talking about hitting someone in the face with a gun.  In addition, Quade *was* able to identify the individuals in the two photographs that Holt's counsel had attempted to introduce at trial with a masked gunman, as well as other photographs taken at her apartment on the evening of the robbery.

Finally, Quade testified that Holt had been at her apartment for part of the night of the robbery, sleeping on her couch because he was in an argument with Ricci, his girlfriend.  (*Id.* at 14, 35.)  But she stated that Holt was not hanging out with Dale or R.G. because he was "way older."  (*Id.* at 14.)  She also would have testified that R.G. asked Holt to pawn a couple of guitars for him because he was not old enough, and that R.G. had "swore up and down" to Holt that the guitars were not stolen, and he had "gotten them from somebody for some weed or something."  (*Id.* at 28.)  If called to testify, she would have testified at trial that a few days after police raided Holt's home, *R.G.* called her stating that he believed the police were looking for him, so she told him to get his stuff out of her apartment, which she assumed was stolen based on R.G.'s panicked reaction saying police were coming to her place next.  (*Id.* at 30–31.)  She did not want to talk to the police because she was "on the run from probation" and under the influence of drugs.  (*Id.* at 32.)

### 2.  Lisa Ricci's Testimony

Holt's post-conviction counsel also called Lisa Ricci to testify about written letters that she had provided to Holt's trial counsel, but that trial counsel failed to introduce as evidence

at trial.  Specifically, she testified to there being several letters written to R.G. from various people, including Dale, Biddell and Britney Quade.  (*Id.* at 140.)  Ricci also testified that R.G. had told her where to find the letters because he felt guilty about implicating Holt in the robbery.  (*Id.* at 141, 144.)  However, R.G. refused to talk or testify on Holt's behalf, apparently because he was afraid he would get convicted.  (*Id.* at 144.)

### 3.  Attorney Kronenwetter's Testimony

Defense counsel Kronenwetter confirmed that his theory of defense at trial was two-pronged: (1) another individual, R.G., was the third assailant; and (2) Holt had an alibi.  (*Id.* at 50–51.)  Kronenwetter testified that he intended to call Quade as a witness, and he believed she would be a "very important witness" to corroborate the third-party guilt defense, as well as to provide foundation for the "masked gunman" photos.  (*Id.* at 53–57.)  However, Kronenwetter acknowledged his only having a brief phone call with her, then was "never able to make contact with her again."  (*Id.* at 55.)  He made a "last ditch effort" to subpoena her approximately one day before trial, using someone who had never served process before, but knew Quade and thought he knew where she was.  (*Id.* at 57, 107–08, 136–37.)  Service was unsuccessful and Kronenwetter realized later that he should not have trusted the individual who said he could locate her and should have had her formally served.  (*Id.* at 57.)  Kronenwetter decided to go ahead with trial despite feeling "unprepared with the inability to subpoena" Quade.  (*Id.* at 57.)

Attorney Kronenwetter testified that he also considered calling Michael Hayes as a witness because Hayes was driving a car containing stolen property on the morning after the robbery.  (*Id.* at 61.)  Hayes had also reported to police that R.G. was with Dale the day before

16

the robbery, and in the vehicle shortly after the robbery, around 3:00 or 4:00 a.m.  (*Id.* at 60.) Kronenwetter testified that he "would want to have presented [Hayes]," had no strategic reason for failing to do so, and did not "know why I did not obtain his presence, but I didn't."  (*Id.* at 61.)

To further bolster the third-party assailant defense, Attorney Kronenwetter intended to show that one of the victims had reported to the police that Dale and R.G. had been "casing the apartment the night before," and that R.G. was same size and build as the robber as described by the victims, unlike Holt.  (*Id.* at 70.)  However, Kronenwetter failed to ask relevant questions or put in evidence regarding R.G.'s and Holt's relative sizes.  (*Id.* at 71–72.) Similarly, Kronenwetter had intended to show that Holt's DNA did not match any of the other DNA collected in the case, but he failed to request a DNA analyst.  He admitted his handling of the DNA evidence was "amateurish" and "bad, bad trial practice," because jurors give extra weight to the findings from the crime lab.  (*Id.* at 75–76.)

Attorney Kronenwetter also testified that he was confident Holt would be acquitted based on the photographic evidence of Dale and R.G., together with a gun, the night of the robbery.  (*Id.* at 64.)  Because they had been posted on Dale's Facebook page, he had intended to introduce them during Dale's testimony, and he was not prepared for the state to object to their introduction, particularly because the photographs had been provided by the state.  (*Id.* at 66, 68.)  Counsel testified that if Dale refused to identify the individuals in the photographs, he could have asked both Ricci and Holt to do so, as R.G. had an identifying mark on his hand that was visible in the photographs.  (*Id.* at 116.)

Finally, Kronenwetter admitted that his questioning and impeachment of Dale did not go as he intended.  Once Dale "essentially stopped answering questions," counsel admitted to

"sort of shut[ting] down" and "really los[ing] all strategic sense with that witness." (*Id.* at 88, 92.) Counsel stated that he "probably should have asked for an adjournment" or at least to strike Dale's testimony. (*Id.* at 92.)

### 4. Circuit Court's Decision

The circuit court denied Holt's post-conviction motion. It concluded that exclusion of the Facebook photographs did not violate Holt's constitutional rights because Holt established through other evidence that Dale and R.G. knew each other, spent time with each other and had been photographed brandishing guns together near the time of the robbery. (Dkt. #15-13, at 4.) The court summarized that "the jury was fully aware of the very evidence Mr. Holt claims he was deprived of providing them." (*Id.*) The court also rejected Holt's ineffective assistance of counsel claims, holding that Holt was not prejudiced by any of counsel's alleged deficiencies. Some of the unpresented evidence likely would have backfired, including Britney Quade's testimony, because it contradicted Holt's own testimony about his alibi, and other evidence was not as helpful as Holt argued it would be.

### D. Wisconsin Court of Appeals' Decision

The Wisconsin Court of Appeals affirmed. It held that even if the trial court erroneously exercised its discretion in excluding the Facebook photographs, it was harmless error because the pictures would have been cumulative of other evidence and testimony. As to Holt's ineffective assistance of counsel claims, the court of appeals held counsel's performance was either not deficient or Holt was not prejudiced. The court likewise found no aggregate prejudice from counsel's errors when viewed collectively. *Holt*, 2019 WI App 54.

The Wisconsin Supreme Court denied Holt's petition for review (dkt. #14-3), leaving the court of appeals' decision as the last adjudication on the merits for federal habeas review.

OPINION

Petitioner Holt contends that his conviction should be vacated because: (1) the trial court erred in excluding the Facebook photographs showing R.G. and Dale together the night of the robbery; and (2) his trial counsel also performed well below any reasonable, baseline standard in several ways. Holt also contends that but for these cumulative errors, a reasonable jury would have found him *not* guilty.

Because the Wisconsin Court of Appeals purported to resolve these claims on the merits, the question for this court is not whether the trial court erred or trial counsel was ineffective, but whether the *Wisconsin Court of Appeals' analysis* of the constitutional questions was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law "if the rule the decision applies differs from governing law set forth in Supreme Court cases." *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (citations omitted). A decision involves an unreasonable application of Supreme Court precedent "if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." *Id.*

Alternatively, Holt can obtain relief if he shows that the state court's adjudication of his claims was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). Again, however, a federal court owes deference to the state court, especially to any underlying state court findings of fact and credibility

determinations against a petitioner, all of which are presumed correct unless the petitioner produces "clear and convincing" evidence to the contrary.  28 U.S.C. § 2254(e)(1); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014); *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013).

The court will first address petitioner Holt's arguments regarding exclusion of the Facebook photos, then turn to his numerous assertions that trial counsel was ineffective.

### A.  Trial Court's Exclusion of Facebook Photographs

With some restrictions, the admission of evidence generally rests within the trial court's discretion.  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  However, the United States Constitution protects a criminal defendant's right to present a complete defense, which includes the right to testify, present evidence and cross-examine witnesses against him.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations omitted); *Sarfraz v. Smith*, 885 F.3d 1029, 1037 (7th Cir. 2018).  A trial court's exclusion of relevant evidence from a criminal trial may violate this right if the exclusion is "arbitrary or disproportionate to the purposes [the evidentiary rule] is designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  For example, a ruling that "exclude[s] important defense evidence but that did not serve any legitimate interests" violates the constitution.  *Id.* at 325.

Holt contends that he was denied his constitutional rights to confront his accusers and present a complete defense when the trial court precluded him from presenting two Facebook photographs showing R.G. with one of the convicted robbers (Lyndell Dale) just hours before the robbery, wearing clothing consistent with that of the third assailant and holding a handgun consistent with the gun used in the robbery.  Holt contends that these pictures would have

been powerful additional evidence for the jury to conclude that *R.G.* was the third assailant, as opposed to Holt, who had no known prior interactions with Dale or Biddell, or at least to leave the jury with reasonable doubt as to whether that assailant was Holt or his nephew R.G.

The state makes two arguments in response. First, that Holt procedurally defaulted this argument because he failed to develop the constitutional nature of it in the state courts. Second, that the Wisconsin Court of Appeals' resolution of this claim was based on a reasonable interpretation and application of federal law and, thus, must be upheld by this court.

### 1.  Fair presentment of constitutional claim

To preserve a claim for federal habeas review, a state prisoner must fairly present the operative facts and legal principles controlling the claim through a full round of state court review. *Reynolds v. Hepp*, 902 F.3d 699, 705 (7th Cir. 2018)*; Mulero v. Thompson*, 668 F.3d 529, 536 (7th Cir. 2012). Contrary to the state's argument, Holt fairly presented the exclusion of the Facebook photographs as a constitutional issue. Specifically, he argued in both his postconviction motion and appellate briefs that the court's exclusion of the Facebook photos violated his rights to confrontation, to due process and to present a complete defense in violation of the Sixth and Fourteenth Amendments of the U.S. Constitution. (Postconviction mot. (dkt. #15-6) 1, 23–26); (App. Br. (dkt. #14-4) 15–17.) Holt also cited a number of state court decisions containing similar constitutional analyses. *E.g., State v. Prineas*, 2012 WI App 2, ¶ 15, 338 Wis. 2d 362, 809 N.W.2d 68; *State v. St. George*, 2002 WI 50, ¶ 14, 252 Wis. 2d 499, 643 N.W.2d 777. Further, postconviction and appellate counsel alleged a pattern of facts well within the mainstream of constitutional litigation relating to Holt's due process rights of confrontation and to present a defense. Thus, Holt's submissions contained enough detail to

have sufficiently alerted the state courts of his federal constitutional claim.  Nor did the Wisconsin Court of Appeals rely on a procedural default in denying Holt relief, but rather concluded that "exclusion of the photographs did not deny Holt his right to present a defense." *State v. Holt*, 2019 WI App 54, ¶ 10, 388 Wis. 2d 621, 935 N.W.2d 55.

### 2.   Merits of photograph exclusion claim

Turning to the merits of this claim, the court agrees with Holt that the trial court's exclusion of the Facebook photographs on the ground that they lacked "any probative value whatsoever" was clearly erroneous.  (*See* Trial Tr. (dkt. #14-10) 153–59.)  The identity of the third assailant was the central and contested issue in Holt's criminal case, and the photographs would have helped support Holt's defense that the third assailant was R.G., not Holt, given the timing of the photographs, the relationship between R.G. and Dale, the clothing R.G. was wearing, and the presence of a handgun similar to that used in the robbery appearing to be in R.G.'s possession in the photograph.[2]  *See United States v. Sherrill*, 972 F.3d 752, 764–65 (6th Cir. 2020) (affirming admission of photographs showing codefendants together, as they were probative to demonstrate an ongoing relationship and that they "could have committed the instant crime together"); *United States v. Conner*, 924 F.3d 464, 466–467 (8th Cir. 2019)

---

[2] The state argues that the photographs were irrelevant and inadmissible because the masked men could not be identified.  (Resp. Br. (dkt. #20) 20.)  This argument fails because neither the trial nor appellate court relied on the inability to identify the masked individuals as the basis for excluding the photographs.  Although the court of appeals noted that the photographs were "low quality," *Holt*, 2019 WI App 54, ¶¶ 23, 27, that observation was about the value of the evidence, not admissibility.  Moreover, Holt was never given the opportunity to present evidence identifying the masked individuals.  The state also argues that the photographs would have been inadmissible without testimony from the person who took the photographs (Britney Quade), but the state cites no legal authority to support this, nor did either state court rely on an authenticity problem to exclude the photographs.

(concluding video of defendant from three weeks before the robbery wearing clothing consistent with the robber made it more probable that he committed the robbery); *United States v. Gibbs*, 797 F.3d 416, 423 (6th Cir. 2015) ("photographic evidence that Defendant at one time had a gun, that appears to be in all respects the same as the one described by the witnesses, makes it more likely that he did in fact have that gun (and the ammunition for it) at the time of the incidents").

Again, however, the question for this court is not whether the trial court erred, but whether the Wisconsin Court of Appeals' resolution of the constitutional question despite finding error was "contrary to, or involved an unreasonable application of clearly established federal law," or was based on "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). In assessing Holt's claim regarding the Facebook photographs, the court of appeals rejected the trial court's ruling that the photographs were irrelevant, instead finding "this determination should have been left for the jury to decide how much weight to give this relevant evidence." *Holt*, 2019 WI App 54, ¶ 28. Nevertheless, the court found the trial court's decision to exclude this evidence, if erroneous, was "harmless error," because the Facebook photographs were cumulative of other evidence presented at trial, and of Detective Noel's testimony in particular. *Id.* at ¶¶ 27, 30.

The court of appeals' harmless error analysis was contrary to clearly established U.S. Supreme Court precedent. 28 U.S.C. § 2254(d). Specifically, in *Chapman v. California*, 386 U.S. 18 (1967), the Supreme Court held that, for cases reviewed on direct appeal, a constitutional error is only harmless if *the state* proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24. If the court is convinced that "the error did not influence the jury, or had but very slight effect, the verdict

and the judgment should stand." *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).  If, however, the court is *not* fairly assured that there was no effect on the verdict, it must reverse.  *Id.* Whether an error is harmless in a particular case depends upon a host of factors, including whether the testimony was cumulative and the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

Instead of applying the *Chapman* standard, the Wisconsin Court of Appeals cited state evidentiary rules and a Wisconsin *civil* case with a completely different standard for assessing harmless error.  *See* Wis. Stat. § 904.03 (relevant evidence "may be excluded if its probative value is substantially outweighed by…considerations of…needless presentation of cumulative evidence"); *Martindale v. Ripp*, 2001 WI 113, ¶¶ 30-31, 246 Wis. 2d 67, 629 N.W.2d 698 (asking whether the error "affected the substantial rights of the party," meaning "there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue").  Neither did the court of appeals allocate the burden to prove harmlessness to the state; nor did it discuss the strength of the state's evidence or apply a "beyond a reasonable doubt" standard in its harmless analysis.  Instead, the court deemed the error harmless based on its conclusion that the excluded photographs were cumulative, stating "even if the masked persons photos had some relevance, it was substantially outweighed by considerations of needless presentation of cumulative evidence." *Id.* at ¶ 27.

Thus, rather than performing a harmless error analysis consistent with established federal constitutional law, the state appellate court appears to have performed a Rule 403 analysis, merely balancing relevance with cumulativeness.  This cumulativeness analysis was particularly unreasonable given that the court failed to explain how a detective's description of photographs could be "cumulative" of the actual photographs.  Nor did the court acknowledge

that presenting the photographs would take only a few minutes, at most, and would not present a substantial burden on the court, cause confusion, or waste jury time.  Finally, and most importantly for the habeas analysis, concerns about cumulativeness, confusion and even prejudice addressed by evidentiary rules do not trump constitutional concerns that admissible evidence capable of undermining the state's proof of a defendant's guilt beyond a reasonable doubt was excluded.  *See Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (risk of prejudice or bias against witness does not trump defendant's right to cross-examination of witness); *Rhodes v. Dittmann*, 903 F.3d 646, 656 (7th Cir. 2018) ("[O]rdinary rules of evidence must give way when they prevent a defendant from presenting evidence central to the defense.")

Because the Wisconsin Court of Appeals applied the wrong standard for assessing harmless error, this court must conduct a *de novo* harmless error analysis, albeit recognizing that on habeas review, the standard is *not* the *Chapman* "harmless beyond a reasonable doubt" standard.  Rather, collateral proceedings like this one "require more from the habeas petitioner." *Armfield v. Nicklaus*, 985 F.3d 536, 544 (7th Cir. 2021) (citing *Davis v. Ayala*, 576 U.S. 257, 267 (2015).)  In particular, a petitioner "is not entitled to habeas relief based on trial error unless he can establish that it resulted in actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  In other words, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal*, 513 U.S. at 436.  In answering this question, the court employs a *de novo* review of the entire record, asking "whether a properly instructed jury would have arrived at the same verdict, absent the error." *Czech v. Melvin*, 904 F.3d 570, 577 (7th Cir. 2018).  Said another way, "a constitutional error is considered harmless [on habeas

review] unless it can be shown to have 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 577 (citing *Brecht*, 507 U.S. at 622.)

Here, Holt argues that exclusion of the Facebook photographs had a substantial and injurious effect on the verdict because the jury was denied photographs taken the same night as the robbery, showing R.G. holding a black and silver gun, which matched the description of the gun used in the robbery as given by the victims. This court has grave doubts that on top of contradictory testimony by key witnesses, a jury would not find these pictures provided more compelling evidence supporting Holt's third-party guilt defense than Detective Noel's brief testimony alone that he had viewed photographs of Dale and R.G. displaying what appeared to be firearms, including one photo taken "quite near in time to" the robbery, with R.G. possibly wearing the same or similar black hoodie as the third robber. (Trial Tr. (dkt. #14-10) 103, 107.)[3]

---

[3] The court of appeals stated that Holt "forfeited" the argument that the color of the gun rendered the photos non-cumulative by not raising that argument during trial and raising it for the first time on appeal. *Holt*, 2019 WI App 54, ¶ 29. However, whether Holt's counsel mentioned the gun's appearance at trial is irrelevant to a proper harmless error analysis. A harmless error analysis assumes the jury would have seen the photographs and seen for themselves that the silver handgun in the photographs was consistent with the robbery weapon. *See Tyson v. Trigg*, 50 F.3d 436, 447 (7th Cir. 1995) (in conducting harmless error analysis, court considers how inclusion of excluded evidence would affect jury's verdict). Defense counsel's arguments to the court about relevance have no bearing on a harmless error analysis. Regardless, a review of the trial transcript shows that there was no "cumulative" objection to the photographs at trial. Instead, the state objected on grounds of relevance and propensity evidence, and the court erroneously excluded the photographs based on lack of relevance. (Trial Tr. (dkt. #14-10) 157–160.) Further, the trial judge cut defense counsel off as he was attempting to make his record regarding the photographs. (*Id.* at 160.) Finally, Holt expressly raised the issue regarding the color of the gun in his postconviction motion. (Postconviction (dkt. #15-6) 13, 25.) Thus, the court of appeals' statement that Holt raised this issue "for the first time on appeal," *Holt*, 2019 WI App 54, ¶ 29, is factually erroneous.

26

While admittedly a close question, the court cannot discount its own grave concerns about whether exclusion of these photographs on this record may have had a substantial and injurious effect on the verdict.  As the Wisconsin Court of Appeals itself recognized, the state's case against Holt was not "overwhelming."  *Holt*, 2019 WI App 54, ¶ 76.  The only evidence linking Holt to the robbery was prior inconsistent statements of Dale, Biddell, and Holt's former cellmate, all of which were retracted at trial; the stolen property that Holt sold or was found in his bedroom and apartment (which could be attributed to R.G.); one victim's testimony that the third assailant stated he was from east Madison; and one of the victim's stating that Holt looked "familiar" and "like" the third assailant.  In fairness, other evidence undermined Holt's defenses, including his lies about the stolen property and his changing alibi, but not necessarily in ways a reasonable jury could only find explainable by Holt's participation in the robbery itself.

Indeed, the state's case was not strong overall as:  there was no positive identification by the victims; no unrecanted testimony implicating Holt in the robbery itself; no confession; no DNA evidence linking Holt to the crime; and no evidence of a prior relationship between Holt and the other assailants or victims.  In contrast, there was substantial circumstantial evidence that R.G. was the third robber, and the photographs *could* have persuaded the jury that R.G., not Holt, was involved in the robbery.  For example, defense counsel could have suggested to the jury that R.G. was in the "Vendetta squad" with Dale, and that the picture showed R.G. and Dale, right around the time they planned the robbery, holding the robbery weapon, whereas no similar photographs including Holt were found.  Other evidence connecting R.G. to the robbery made this a viable defense—at least enough to raise a reasonable doubt about Holt's guilt in the mind of the jury—including the fact that both victims initially

identified the third assailant by R.G.'s nickname ("Deuce") before recanting, the close relationship between Dale, Biddell, and R.G., and R.G.'s living at Holt's residence, where some stolen property was found.

Defense counsel likewise could have used the photographs to poke holes in the quality of the police's investigation. For example, counsel could have questioned police officers about their efforts to locate the gun in the pictures, questioned Dale or R.G. about it, or showed it to the victims to see if they could identify it as the robbery weapon. These apparent failures to investigate would also have been legitimate challenges to the caliber of the investigation—especially since law enforcement knew about those photos and the existence of the weapon. *E.g., Kyles v. Whitley*, 514 U.S. 419, 446 (1995) ("the defense could have examined the police to good effect on their knowledge of [excluded evidence] and so have attacked the reliability of the investigation in failing to even consider" the possibility that the defendant was innocent).

In sum, the court cannot conclude that the jury, had they seen the Facebook photographs, would have arrived at the same verdict. Thus, Holt has persuaded the court that the trial court's exclusion of the photographs caused him actual prejudice, and he is entitled to habeas relief.

### B. Ineffective Assistance of Counsel Claims

Holt also contends his trial counsel provided ineffective assistance by failing to investigate and present evidence that would have corroborated his testimony and undermined the state's case in 14 different ways. The court considers claims of ineffective assistance under the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under the *Strickland* standard, a petitioner must demonstrate both constitutionally

28

deficient performance by counsel *and* actual prejudice as a result of the alleged deficiency. *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).  To demonstrate deficient performance, the petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88.  To demonstrate actual prejudice requires a petitioner to demonstrate further "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

Because the Wisconsin Court of Appeals addressed the merits of Holt's ineffective assistance of counsel claims, this court's standard of review is particularly deferential under 28 U.S.C. § 2254(d)(1).  In particular, Holt's claims fail if "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 562 U.S. 86, 89 (2011).  Indeed, so long as the Wisconsin Court of Appeals "took the constitutional standard seriously and produced an answer within the range of defensible positions," this court must deny relief.  *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (citation omitted).

In considering counsel's performance, the court has divided Holt's claims into three categories: uncalled witnesses; omitted evidence; and failures to object and request jury instructions.

### 1.  Uncalled Witnesses

Holt argues that it was deficient performance for his trial attorney to fail to call Britney Quade and Michael Hays as witnesses because both could place R.G. with Dale shortly before and after the robbery.  In considering Holt's arguments, the Wisconsin Court of Appeals concluded that trial counsel's decision not to call Britney Quade was a reasonable, strategic decision because her testimony would have undermined Holt's alibi defense and could have

been impeached due to her close relationship with Holt.  Further, Quade's testimony could be undermined by the fact that during the relevant time, she was using methamphetamines and "on the run from probation."  As for Hays, the court of appeals did not discuss deficient performance, but found trial counsel's failure to call him was not prejudicial, as Hays' testimony would not have "shed significant additional light on facts that mattered." *Holt*, 2019 WI App, ¶ 43.

Generally, a lawyer's decision to call or not to call a witness is a strategic decision not subject to review.  *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005).  In this instance, however, the court agrees with Holt that his counsel's failure to call Quade and Hays was both deficient and prejudicial, and that the court of appeal's conclusions do not square with the record before the state courts as to either witness for the reasons that follow.

### a. Britney Quade

With respect to Quade, Attorney Kronenwetter testified at the postconviction hearing that he had *no* strategic reason not to call her.  In fact, he wanted to and intended to call her as a witness.  Kronenwetter further characterized Quade as a "very important witness" who would have corroborated elements of Holt's third-party perpetrator defense.  He also acknowledged that Holt wanted him to call Quade and provided a hand-written list of potential witnesses with Quade's name at the top, circled.  Thus, Quade's absence at trial was *not* due to a strategic decision, but instead counsel's ineffective and late efforts to subpoena her presence at trial.  In fact, Kronenwetter acknowledged that he did not even attempt to serve Quade formally, but instead made a "last ditch effort" to serve her, "maybe a day before trial," using a former client who did "odd jobs" for him and had never served a subpoena before.  (Dkt.

#14-14, at 56–57,107,136.)  *See Washington v. Smith*, 219 F.3d 620, 629–30 (7th Cir. 2000) (last-minute issuance of subpoena for hard-to-find witness deemed deficient and unreasonable).

Moreover, when Kronenwetter was asked directly about whether presenting Quade would conflict with his alibi defense, he provided an explanation that harmonized the two alibis, or at least mitigated any potential damage to Holt's credibility.  Specifically, there was no evidence besides Quade's testimony that Holt was at her apartment the night of the robbery, whereas the photographic evidence proved that R.G. and Dale were there.  Thus, Kronenwetter explained, Quade may have been confused about the night that Holt was there, particularly given her drug use.  He further testified that Quade's testimony was important to the defense and, even knowing that she could have contradicted Holt's alibi, he "absolutely" would have called her as a witness had he effectively subpoenaed her presence.  (Dkt. #14-4, at 132–35.) The court of appeal's decision to disregard this testimony, and instead discuss a strategy that Kronenwetter never espoused, was an unreasonable application of the law and facts.  *See Goodman v. Bertrand*, 467 F.3d 1022, 1029 (7th Cir. 2006) ("Although counsel is strongly presumed to have rendered adequate assistance based upon his or her reasonable professional judgment, it is not the role of a reviewing court to engage in a post hoc rationalization for an attorney's actions by constructing strategic defenses that counsel does not offer.") (internal quotations and citations omitted).

The court concludes that not only did counsel's failure to call Quade constitute a deficient performance, but it was prejudicial.  Although Quade may have slightly undermined Holt's alibi defense, her testimony would have significantly bolstered his third-party assailant defense.  Quade would have placed R.G. with the other robbers shortly before and after the

31

robbery.  She would have testified that:  she took photographs of R.G. with Dale; R.G. dressed consistently with the third assailant and held a gun resembling the descriptions of the robbery weapon; she observed R.G. carrying bags of property after he returned to her apartment; and she was present when R.G. asked Holt to pawn the guitars.  Thus, a reasonable probability exists that after hearing Quade's testimony, a jury would have had reasonable doubt as to Holt's guilt.

### b.  Michael Hays

Similarly, Holt's counsel had *no* strategic reason for failing to call Michael Hays at trial. Again, Attorney Kronenwetter testified that he wanted to call Hays, and further that he simply did not "know why I did not obtain his presence, but I didn't."  (Dkt. #9-13, at 61.)  Unlike with Quade, the Wisconsin Court of Appeals assumed trial counsel's performance was deficient in not calling Hays, but ultimately concluded Holt had failed to show a reasonable probability that the result would have been different but for counsel's failure to call Hays.  *Holt*, 2019 WI App 54, ¶ 38.

This court must consider whether the court of appeals applied *Strickland* reasonably in concluding that Holt did not show prejudice.  *See Carter*, 819 F.3d at 943 (even if counsel's performance was deficient for failing to interview potential witnesses, conviction must be upheld if state court's prejudice analysis was not unreasonable).  So long as the state court's conclusion is "one of several equally plausible outcomes," the court must allow the decision to stand.  *Frentz v. Brown*, 876 F.3d 285, 295 (7th Cir. 2017).

During a police interview, Hays told police that:  he had observed R.G. with Dale the night of the robbery; R.G. and Dale had asked Hays if he wanted to go to a party with them in

Stevens Point that night; and in the early morning shortly after the robbery, R.G. and Dale picked Hays up in Biddell's car, with R.G. driving *and* with stolen goods in the car. In other words, Hays placed R.G. with at least one of the robbers (Dale) both before and after the robbery, when R.G. was driving the other robber's vehicle with property stolen from the robbery. In contrast, at no time could Hays place Holt with Dale, Biddell or R.G. the night before or morning after the robbery. Thus, the jury could have inferred from Hays's statements that R.G., not Holt, was involved in the robbery as the third assailant.

The Wisconsin Court of Appeals' found the value of Hays' testimony to be insignificant and "exaggerate[d]" by Holt, but that conclusion is unreasonable in light of other circumstantial evidence of R.G.'s involvement, including the bolstering pictures wrongly excluded by the trial court. Thus, Hays' testimony could have been highly valuable to the defense in sowing reasonable doubt, and with it, inferring a reasonable probability that the results of the trial would have been different.

### 2. Omitted Evidence

Turning to the next category, Holt points to several pieces of evidence that his trial counsel failed to present at trial, arguing that there is a reasonable probability that its inclusion would have resulted in acquittal, either individually or collectively. The Wisconsin Court of Appeals assumed deficient performance as to most of this evidence as well, but concluded that Holt had failed to show prejudice. As discussed, this court also concludes that trial counsel was deficient for failing to introduce at least some of the omitted evidence but finds the omissions likely resulted in material prejudice to Holt's defense. This is particularly true when the court assesses the cumulative effect of *all* the errors, rather than reviewing each error in

isolation. *See Washington v. Smith*, 219 F.3d 620, 634–35 (7th Cir. 2000) ("Evaluated individually, these errors may or may not have been prejudicial to Washington, but we must assess 'the totality of the omitted evidence' under Strickland rather than the individual errors."); *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("[E]ven if individual acts or omissions are not so grievous as to merit a finding of incompetence or of prejudice from incompetence, their cumulative effect may be substantial enough to meet the *Strickland* test.").

### a. DNA Evidence

Holt argues that trial counsel was ineffective in failing to call an expert witness to testify that the crime laboratory analysis had *excluded* Holt as a source of DNA found on items at the scene of the robbery. Specifically, after collecting and testing Holt's DNA, crime laboratory analysts excluded Holt as the source of any DNA collected from items found at the scene of the robbery, including from a piece of toilet paper that the robbers allegedly used to wipe away traces of fingerprints. Indeed, as a result, no DNA evidence was presented at trial and no DNA analyst was called by either side.

In his opening statement, Holt's counsel further represented to the jury:

> I believe you will see evidence that clearly excludes Mr. Holt as the source of any DNA discovered from this armed robbery. You will see that officers did extensive work on this case; that they collected evidence from the scene, lifted fingerprints, found DNA. But none of that, none of that will be linked to Maurice Holt at the end of this trial.

(Dkt. #9-8, at 79–80.) Holt's counsel also concluded his closing argument by saying, "keep in mind [that] you heard testimony that DNA was taken from various items in the [victims'] apartment and no testimony that any DNA in this case matched my client." (Dkt. #9-10, at

185.)  To make matters worse, the prosecutor *began* his rebuttal argument on the same topic, saying that there was "no testimony about DNA, one way or the other."  (*Id.*)

Defense counsel's failure to introduce actual DNA evidence was deficient.  Moreover, Attorney Kronenwetter conceded at the postconviction hearing that his failure to present DNA evidence was not strategic, but was based on the incorrect assumption that the state would call a DNA analyst.  (Dkt. #14-14, at 73–76.)  This assumption made no sense, as the DNA evidence would not have benefited the state.  Kronenwetter further conceded that his handling of the DNA evidence was "amateurish" and "bad, bad trial practice," because jurors give extra weight to the findings from the crime lab.  (*Id.* at 75–76.)

As for prejudice, the Wisconsin Court of Appeals found no reasonable probability that the result would have been different if the jury had heard an expert affirmatively testify that none of Holt's DNA was detected on any item recovered and tested in the investigation, reasoning that Holt's involvement in the robbery could have been consistent with him leaving little detectible DNA at the scene.  *Holt*, 2019 WI App 54, ¶ 48.  However, this conclusion was based on an unreasonable interpretation of the facts.  Specifically, the court of appeals failed to acknowledge that the victims and Dale indicated to police that a piece of paper found on the floor of the apartment *was* touched by the third assailant.  (*See* Dkt. ##15-8, at 40; 25-20, at 1–2; 15-21, at 4.)  Based on these statements, Detective Noel sought to test Holt's DNA specifically, indicating in an affidavit that "it is probable that this tissue paper . . .will yield Maurice Holt's DNA."  (*Id.*)  Instead, the crime lab actually excluded Holt as the source of any DNA from the paper, though there was unknown male DNA present.  If the jury had heard this evidence, along with all of the other, omitted evidence undermining Holt's participation in the robbery itself already discussed in this opinion, there is a reasonable probability they

would have found that someone besides Holt was present during the robbery or, at minimum, reasonable doubt that Holt was present.

### b. Height evidence

Holt next argues that it was ineffective for trial counsel to fail to offer evidence at trial that Holt was 5'9" (and 203 pounds), while his nephew, R.G., was 6'0" (and 195 pounds). Evidence of this alleged three-inch height difference mattered, Holt contends, because Victim 1 testified that the third assailant appeared to be 6'0" (and 210 pounds), and Victim 2 testified that the third assailant appeared to be 6'0" (and 200 pounds), meaning the victims' height descriptions of the third robber matched R.G., not Holt.

Attorney Kronenwetter testified that he "certainly" intended Holt's height differential to be part of the misidentification defense and there "wasn't any reason" for his failure to offer that evidence into the trial record. (Dkt. #14-14, at 69–73). In other words, counsel's failure was non-strategic, unreasonable and deficient. *See Carter v. Duncan*, 819 F.3d 931, 942 (7th Cir. 2016) ("The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness.") (citation omitted).

However, the Wisconsin Court of Appeals again concluded that even if counsel's performance was deficient in this regarding, Holt failed to show prejudice, specifically observing the height difference was not notable because a reasonable juror would understand that, at least in circumstances like this, perceived heights are at best rough estimates. *Holt*, 2019 WI App 54, ¶ 50. The court finds this conclusion was itself unreasonable in light of the question asked *by the jury* during deliberations about "the actual height and weight of Maurice Holt?" The question shows that the jury was likely concerned whether Holt's height and weight

36

matched that of the third assailant as described by the victims, which went unanswered because of trial counsel's failure to offer this evidence into the record.  With this information, in combination with other omitted evidence discussed here, there is a reasonable probability that the jury would have had reasonable doubt about Holt's involvement in the robbery.

### c.  Additional victim statements regarding R.G.

Holt next argues that Attorney Kronenwetter was deficient in failing to introduce other evidence that the victims initially identified "Deuce" as the third assailant.  Specifically, one victim completed a "non-consent statement" that identified Deuce as the third robber, and the other victim told police that he believed Deuce and Dale had been "casing the apartment" the night before.  (Dkt. #14-10, at 13–25.)  Kronenwetter acknowledged his failure to present these statements was non-strategic, caused by oversight and confusion.  (Dkt. #14-14, at 68–70).  Nevertheless, the Wisconsin Court of Appeals found no deficient performance or prejudice, concluding that this would have been cumulative evidence because the jury had already learned that both the victims initially identified R.G. as the third assailant, before later withdrawing their accusation.

The court of appeal's conclusion is well taken with respect to the "non-consent statement," as that statement added nothing new to the victims' initial identification of Deuce as the third assailant.  However, the victim's description of R.G. and Dale as "casing the apartment" was *not* cumulative.  Rather, this statement could have been particularly helpful to Holt's defense because, although the victims testified to being "confused" when making their initial accusation against Deuce/R.G., they did *not* say they were confused about thinking Dale and R.G. were "casing the apartment."  In other words, this statement, again in conjunction

with other omitted evidence already recited in this opinion, is one more reason to find non-strategic omissions by trial counsel may have caused a jury reasonable doubt as to whether R.G., and not Holt, was the third person involved in the robbery. *See Dixon v. Snyder*, 266 F.3d 693, 703–04 (7th Cir. 2001) (trial counsel found deficient for failing to cross-examine witness with pretrial statements, and deficiency was prejudicial in light of weak evidence of guilt).

### d.  R.G. Facebook messages and Dale's letter to R.G.

Holt points to two, final pieces of evidence that he believes his counsel should have introduced at trial.  As for the three sets of post-robbery text exchanges on a Facebook page maintained by R.G., which (at least according to Holt) suggest R.G. was the third assailant, the Wisconsin Court of Appeals concluded Holt had failed to show either deficient performance or prejudice in their exclusion from trial.  This court concludes that the court of appeals' analysis of this evidence was a reasonable application of the law and facts.  In particular, the court of appeals acknowledged that at least one set of texts -- exchanged six weeks following the robbery -- was likely admissible and "may raise a reasonable inference that R.G. was fearful that he would be arrested because he was the third assailant." *Holt*, 2019 WI App 19, ¶ 56. Specifically, an unidentified person wrote to R.G. that he should get "on the bus" and "out of there," to which R.G. allegedly responded: "Yea I have no choice they have the dude I was with 30 years I'm not gonna sit here to get caught." *Id.*  As for Dale's letter, the court of appeals stated that a juror *could* interpret the letter as Dale "falsely put[ting] the robbery handgun into the hands of Holt, as opposed to into the hands of either Dale or Biddell." *Id.* ¶ 59.

As the court of appeals went on to explain, however, both of those interpretations were not the only reasonable interpretations of the evidence.  The messages and letter were

ambiguous, and a jury could have reasonably reached different conclusions about their meanings that are less helpful to Holt.  *Id.* ¶ 57, 59.  This court agrees, and cannot conclude that the court of appeals' finding of no prejudice was unreasonable as a matter of law.

### 3.  Failure to Object and Request Specific Jury Instructions

The final category of ineffective assistance claims concerns defense counsel's failure to (1) object to prejudicial evidence, (2) recognize that he opened the door to prejudicial evidence, and (3) request certain jury instructions.  Specifically, Holt argues that counsel should have objected and moved to strike:  Dale's testimony; Detective Noel's reference to Holt as a "drug dealer"; and the prosecutor's closing argument in which he argued, falsely, that Holt's alibi witness had "no convictions" prohibiting him from spending time with Holt.  Holt further argues that counsel acted deficiently by asking Holt's girlfriend, Ricci, why Holt spent the weekend away, because that question opened the door to the state's introduction of evidence that Ricci suspected Holt had been engaging in robberies.  Finally, Holt argues that counsel failed to mitigate any of these errors by not requesting a cautionary jury instruction on other acts and prior convictions, as well as an alibi instruction that would have shifted the burden of proof to the state.

The Wisconsin Court of Appeals determined that Holt failed to prove either deficiency or prejudice as to each of these claims.  Generally, this court defers to the state court's assessment as it must since its analysis is a reasonable application of federal law and the facts of the case.  Counsel's errors that fall under this category were relatively minor when considered in the context of the entire trial.  Specifically, Dale's testimony was not particularly good for either the state or Holt, as he recanted his accusation of Holt then refused to answer most

other questions.  Striking his testimony would likely have had no effect on the jury's verdict.  Similarly, the prosecutor's statements about Andre Kelly's lack of prior convictions were relatively minor, particularly in light of other problems with Holt's alibi defense.  Detective Noel's reference to Holt being a drug dealer was slightly more problematic, as it gave Holt a potential motive to participate in the robbery, but the reference was brief and there was no further discussion of drug dealing or a motive for Holt.  Nor did the state argue this point during closing arguments.  Thus, the court of appeals' conclusion that the reference was insignificant was not unreasonable.  As for counsel's question to Ricci that "opened the door" to the state asking questions about his "hitting licks," the court agrees with the state court that counsel's original question was not unreasonable, so his performance was not deficient in that regard.

Finally, although the court agrees with Holt that his counsel should have requested cautionary instructions on "other acts" and "prior convictions," as well as an alibi instruction, the state court reasonably concluded that Holt had failed to show prejudice here.  Both Holt's counsel and the prosecutor explained to the jury that Holt's prior convictions were to be used only for assessing his credibility.  (Dkt. #14-11 160, 179.)  And it was clear from Holt's evidence and his counsel's argument that he was asserting an alibi defense *and* that the state had the burden of proof beyond a reasonable doubt.  Under these circumstances, Holt has not shown a reasonable probability that, but for counsel's failure to request these instructions, the jury's verdict would have been different.

## C.  Conclusion

While some of Holt's challenges to his conviction are unpersuasive or too minor to merit habeas relief, the court is troubled by several of Holt's claims, as well as the Wisconsin Court of Appeals' resolution of those claims.  In particular, Holt's trial did not reliably test whether he was in fact the third robber, and the state appellate court's decision to the contrary is an unreasonable application of federal constitution law.  Therefore, the court will grant Holt's petition for a writ of habeas corpus and will direct respondent to release Holt within 120 days *unless* the state elects to retry Holt before then.  *Owens v. Duncan*, 781 F.3d 360, 366 (7th Cir. 2015) (giving state 120 days to release or retry petitioner after awarding habeas relief); *Ray v. Clements*, 700 F.3d 993, 1018 (7th Cir. 2012) (same).

ORDER

IT IS ORDERED that:

1.  Petitioner Maurice Holt's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is GRANTED.

2.  The State of Wisconsin has 120 days to either release Holt or initiate criminal proceedings to retry him.

Entered this 2nd day of December, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge